UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ANGELIA R. NEWTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:12-CV-776 JD |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On November 28, 2012, Plaintiff Angelia R. Newton ("Newton"), by counsel, filed her

Complaint seeking review of the final decision of the Defendant Commissioner of Social

Security ("Commissioner") [DE 1]. The Commissioner filed an Answer to Newton's Complaint

on March 28, 2013 [DE 11]. This matter has now been fully briefed and is ripe for ruling. [DE

21, 26, 29]. For the following reasons, the Commissioner's decision is vacated and remanded for

further proceedings consistent with the conclusions in this order.

## I. PROCEDURAL HISTORY

On November 13, 2009, Newton filed an application for disability insurance benefits

("DIB") and supplemental security income ("SSI").[2] (Tr. 16, 157–68). Newton alleged a

---

[1] Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013.
Pursuant to Fed. R. Civ. P. 25(d), Colvin is substituted for Michael J. Astrue as the Defendant in
this action. No further action needs to be taken as a result of this substitution. 42 U.S.C. § 405(g)
("Any action instituted in accordance with this subsection shall survive notwithstanding any
change in the person occupying the office of Commissioner of Social Security or any vacancy in
such office.").

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R.
§ 401.1501 *et. seq.*, while the SSI regulations are set forth at 20 C.F.R. § 416.901 *et. seq.*
Because the definition of disability and the applicable five-step process of evaluation are

disability beginning October 15, 2009 resulting primarily from her rheumatoid arthritis and fibromyalgia. (Tr. 157, 164, 217). Newton's applications were initially denied on March 2, 2010, and again upon reconsideration on May 14, 2010. (Tr. 89, 105). Consequently, on May 25, 2010, Newton requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 115–16).

On June 15, 2011, Newton, represented by counsel, appeared and testified at a hearing held before ALJ John H. Metz in Indianapolis, Indiana. (Tr. 36). Two medical experts and a vocational expert also testified. (Tr. 37–83). On August 17, 2011, the ALJ issued his decision, denying benefits to Newton based on his finding that she was capable of performing jobs that exist in significant numbers in the national economy. (Tr. 16–30). Newton requested a review of the ALJ's decision; however, the Appeals Council denied Newton's request for review on September 28, 2012, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–3, 12). Newton thereafter filed a complaint with this court on November 28, 2012, requesting a review of the Commissioner's final decision. [DE 1]. Jurisdiction is established pursuant to 42 U.S.C. § 405(g).

## II. STATEMENT OF FACTS

Newton was born on July 5, 1967, and was 44 years old at the time of the ALJ's opinion. (Tr. 40). She suffers from a number of ailments, including rheumatoid arthritis, fibromyalgia, asthma, chronic obstructive pulmonary disease, and depression. (Tr. 47). She has a 12th grade education, and previously worked as a certified nurse assistant. (Tr. 28, 45–46). She was laid off from her position as a certified nurse assistant on October 15, 2009, which is considered the last date she engaged in substantial gainful activity ("SGA"). (Tr. 18, 45–46). She worked in an

---

identical for both DIB and SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

office setting for about a month in April 2011, but was unable to maintain her employment due to her health. (Tr. 43–44).

## A.   Medical History

The medical history in the record begins in 2008, though Newton had previously been diagnosed with fibromyalgia in 2000.[3] (Tr. 350, 356). On July 24, 2008, Newton visited Chantel Willmann, a nurse practitioner, for the first time. (Tr. 350). At that appointment, Ms. Willmann observed that Newton had "point tenderness pretty much throughout all the fibromyalgia points, at the base of the neck, on her lower back, just below the elbows, just above the knees, along the upper aspect of the sternum as well." (Tr. 350). Ms. Willmann reiterated Newton's diagnosis of fibromyalgia, and gave Newton a prescription for amitriptyline for that condition. (Tr. 350). Newton visited Ms. Willmann again on August 5, 2008, at which time she reported neck pain between her shoulder blades, and on September 3, 2009 Newton reported muscle and joint pain, including at the back of her neck and her lower back. (Tr. 346–47). Newton reported similar symptoms at her appointment with Ms. Willmann on October 5, 2009, with the addition of pain and swelling in her shoulders, elbows, hands, and fingers. (Tr. 345).

Newton therefore met with Dr. Nighat Tahir, a rheumatologist, for a consultation on October 28, 2009. (Tr. 321). Newton reported that she had noticed pain in her fingers the previous winter, and that she currently had pain in her fingers, wrists, elbows, shoulders, hips, and knees. (Tr. 321). She also reported swelling in her fingers and wrists and stiffness in the morning for about one to two hours, mostly in her hands. (Tr. 321). Dr. Tahir noted that

---

[3] In addition to her treatment for rheumatoid arthritis, fibromyalgia, and asthma, Newton has suffered from mental impairments including bi-polar disorder, anxiety disorder, alcohol and cannabis dependence, and personality disorder. (Tr. 19). The ALJ considered each of these conditions but found them to be nonsevere. (Tr. 19). Newton does not challenge that determination or otherwise raise these conditions on appeal, so the Court will not include details relevant to these conditions in its discussion.

Newton's "recent workup showed rheumatoid factor positive at 109, range 0–14. Anti-CCP antibody positive at greater than 250, range 0–19." (Tr. 321). Dr. Tahir also observed synovial proliferation in both of Newton's wrists and rheumatoid nodules close to Newton's right elbow, left wrist, and left fifth metatarsophalangeal ("MTP") joint, as well as trace synovitis in her elbows. (Tr. 323). Dr. Tahir diagnosed Newton with "Rheumatoid arthritis, seropositive, anti-CCP antibody positive, nodular." (Tr. 323). She further noted, "[Newton] has had symmetric inflammatory polyarthropathy with positive serologies for rheumatoid arthritis. She seems to have an aggressive disease as her serologies are high titer and she also has rheumatoid nodules." (Tr. 323). Dr. Tahir prescribed low-dose prednisone and methotrexate, and ordered further tests and x-rays. (Tr. 323). The x-rays of Newton's right hand showed a narrowing of the third metacarpophalangeal ("MCP") joint, mild narrowing of the first MCP joint, a 4.3 mm cyst in the proximal metaphysis of the third proximal phalanx, and possible narrowing of the carpal-metacarpal joints. (Tr. 333). The x-rays of Newton's left hand also showed "slight narrowing of the 1st and 3rd MCP joints." (Tr. 333).

Newton visited Dr. Tahir for a follow-up appointment on November 30, 2009. (Tr. 335). At that time, Newton had begun taking the low-dose prednisone and methotrexate. Newton reported that her pain was worst in her hands, left knee, and low back, and that she had morning stiffness lasting three to four hours. (Tr. 335). Dr. Tahir noted that Newton "has aggressive rheumatoid arthritis, she has not responded to methotrexate, and is also experiencing some side effects." (Tr. 336). Dr. Tahir began the authorization process for Newton to begin taking etanercept, a biologic medication. (Tr. 336). At a further appointment on December 30, 2009, Dr. Tahir noted that Newton had received one injection of etanercept, but had not been able to continue her treatment since she lost her insurance. (Tr. 338). Newton reported at that time that

she was stiff in the morning for 2 hours, mostly in her hands and back. (Tr. 338). She also noted occasional pain in her shoulders, knees, and ankles. (Tr. 338). Dr. Tahir observed rheumatoid nodules close to Newton's right elbow, left wrist, and left fifth MTP joint, but noted that they were decreasing in size. (Tr. 339). Dr. Tahir's assessment at that time was that Newton "continues to have active rheumatoid arthritis." (Tr. 340).

On January 6, 2010, Ms. Willmann completed a disability questionnaire for Newton. (Tr. 358–63). She stated that Newton's diagnoses were rheumatoid arthritis, myalgias, and rheumatism. She noted that Newton had "joint pain [in her] fingers, wrist, elbows, shoulders, low back, [and] neck" as well as "rheumatoid nodules." (Tr. 360). She further noted that Newton experienced "multiple joint pain [and] swelling." (Tr. 360). In assessing Newton's physical limitations, Ms. Willmann checked that Newton had "Significant" limitations as to lifting, pushing, pulling, bending, squatting, crawling, climbing, reaching above the shoulder, and being around machinery. (Tr. 363). She wrote that Newton "cannot do these [due to] risk of further damage to joints." (Tr. 363). She also opined that Newton "is not able to physically work [due to] the RA [rheumatoid arthritis] & multiple joint pain & swelling," and that Newton "can't do heavy labor" but "could do [a] sit down job." (Tr. 362).

On February 3, 2010, Newton met with Dr. Maya Hosein for a consultative physical examination regarding her disability claim. (Tr. 367–71). Dr. Hosein found that Newton's range of motion was largely normal, with some minor limitations in the lumbar region. (Tr. 368). She also noted that Newton had "tenderness of her second and third MCP joints in the right hand and second through fifth MCP joints on her left hand. Her third MCP joints in the right hand had some fullness on palpitation." (Tr. 371). Dr. Hosein found that Newton "had an extremely small rheumatoid nodule below the right nodule, which have significantly decreased in size," and

further noted that Newton "has the ability to pick up a coin and button a shirt." (Tr. 371). Dr. Hosein recorded her clinical impressions as follows: "Rheumatoid arthritis which was significantly well controlled with addition of etanercept given that she had side effect for high dose methotrexate." (Tr. 371).

On February 17, 2010, Dr. J. Sands conducted a residual functional capacity[4] ("RFC") assessment of Newton. (Tr. 376–83). Dr. Sands checked that Newton could lift or carry items of up to 20 pounds occasionally, and up to 10 pounds frequently. (Tr. 377). He stated that she could stand, sit, or walk for a total of 6 hours in an 8-hour workday. (Tr. 377). He also found that Newton had no limitations relative to pushing or pulling. (Tr. 377). In addition, Dr. Sands observed that Newton's "grip strength was normal and fine finger skills are normal," and that she "has the ability to pick up a coin and button a shirt." (Tr. 377). Dr. Sands additionally found that Newton could "Occasionally" climb stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl. (Tr. 378). He found no manipulative limitations, and expressed that Newton should "avoid concentrated exposure to noxious fumes and unprotected heights." (Tr. 380). Finally, Dr. Sands stated, "[Newton] is partially credible. She reported that she can walk for 10 minutes, stand for 10 minutes, climb about 5 steps and her activity is limited by shortness of breath. She lifts about 15 lbs in each arm. These restrictions are not supported with the ME [Medical Evidence]." (Tr. 381).

On March 1, 2010, Newton again visited Dr. Tahir. (Tr. 559). She noted having morning stiffness lasting for 2 hours, and she reported that she had pain at her left elbow, shoulder, hip and knee, with her worst pain in her hands and back. (Tr. 559). During the physical examination,

---

[4] Residual Functional Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545(a)(1).

Dr. Tahir noted "multiple tender points" and several rheumatoid nodules. (Tr. 560–61). In a subsequent follow-up on April 13, 2010, Newton reported some improvement, as she had been able to begin taking etanercept again. (Tr. 550, 552). She was still experiencing morning stiffness for about two hours, though, and noted that "her worst symptoms are at her low back, neck and her left elbow." (Tr. 550). For her assessment, Dr. Tahir stated, "Her rheumatoid arthritis has improved on current regimen which she will continue. . . . Patient does have rheumatism and chronic low back pain. . . . She might be a candidate for left elbow corticosteroid injection. We might consider imaging her spine if her back pain persists." (Tr. 552).

On May 5, 2010, Ms. Willmann wrote a letter regarding Newton's disability claim. She stated:

> [Newton] has been diagnosed with chronic rheumatoid arthritis. She does have chronic pain secondary due to that diagnosis. [Newton] cannot stand, push, pull or lift objects of much weight at all due to the chronic pain and the rheumatoid arthritis that she has. I cannot give you specific weight limits but certainly I do not believe that she would be able to tolerate any sustained activity for any length of time. I do not think it is reasonable to expect her to do any sort of physical work at this time due to her diagnosis of the rheumatoid arthritis. . . . Also too, she has been diagnosed with fibromyalgia as well.

(Tr. 444). During an appointment with Dr. Tahir that same month, Dr. Tahir performed an ultrasound on Newton's elbows and found synovial hypertophy, so she administered injections of Depo-Medrol and lidocaine into each of Newton's elbows. (Tr. 525–26). In July 2010, Newton reported to Dr. Tahir that she had "good and bad days," that she is stiff in the morning for about 2 hours, and that most of her pain was at her low back, left hip, and occasionally her hands and elbows. (Tr. 521). In September 2010, Dr. Tahir found that Newton's rheumatoid arthritis was "under better control," though Newton was still experiencing significant neck and back pain and morning stiffness for several hours. (Tr. 517–19).

At an appointment with Ms. Willmann in October 2010, Newton noted that she had to temporarily discontinue her rheumatoid arthritis medication in preparation for a foot surgery, and that she could "tell a big difference," and "has a lot more joint pain and discomfort when she is off of those." (Tr. 434). Ms. Willmann warned Newton not to do any "lifting and that sort of thing." (Tr. 434). Newton underwent a Tailor bunionectomy later that month, during which a mass was excised from her foot. (Tr. 402). A biopsy of that mass found "fibrotendonous tissue and synovium with fibrinoid change" and "palisading granuloma with fibrin material consistent with rheumatoid nodule." (Tr. 404). Newton had further appointments with Dr. Tahir in November 2010 and January, February, and May 2011, during which time she experienced some improvement overall, but also noted worsening neck and back pain and continuing morning stiffness. (Tr. 500, 504, 509, 513). Dr. Tahir also administered an injection of Marcain, Depo-Medrol, and Lidocaine at 6 trigger points in Newton's upper and middle back during the February 2011 appointment. (506).

On May 13, 2011, Dr. Tahir completed an RFC questionnaire for Newton relative to her disability claim. (Tr. 591–98). Dr. Tahir reported that Newton's diagnoses included rheumatoid arthritis, fibromyalgia, and fatigue, and that Newton experienced "widespread joint & muscle pain with worst symptoms being at her hands, wrist, elbows, shoulder, neck & back," with "episodic joint swelling." (Tr. 591). She further identified Newton's symptoms as including "widespread joint & muscle pain & excessive fatigue, both causing difficulties with ADL's." (Tr. 591). She noted that "almost all" of Newton's joints were affected episodically, and that Newton's pain would be severe enough to interfere with her attention and concentration often or frequently. (Tr. 592). Dr. Tahir opined that Newton would be incapable of even "low stress jobs" during her "flares" due to "the pain, stiffness, swelling, muscle pain, [and] fatigue." (Tr. 593).

Dr. Tahir finally indicated that Newton's condition would produce good days and bad days, and that Newton would likely be absent from work for more than four days per month as a result of her impairments and treatment. (Tr. 597–98).

## B.    Administrative Hearing and the ALJ's Decision

On June 15, 2011, Newton attended an administrative hearing before ALJ Metz. (Tr. 36). Newton testified briefly regarding her conditions and limitations. She stated that her disabling conditions included "rapid rheumatoid arthritis, fibromyalgia, degenerative arthritis in [her] back, COPD, and depression." (Tr. 47). She reported being able to stand or sit for about a half hour, walk three blocks, and lift about ten pounds. (Tr. 50–51). She said that she would be able to pick up coins, but that once or twice a week she would drop objects due to her flares. (Tr. 51–52). Newton reported being able to perform the majority of her activities of daily living, but noted that her boyfriend did the cooking so that she would not drop anything dangerous. (Tr. 52–59). Newton further testified that she had flare-ups two to three times a week. (Tr. 63). Those flare-ups would last all day, and during that time Newton would not be able to stand, do any chores, or leave the house; should would typically have to lay on a couch on a heating pad. (Tr. 67). Newton also testified that during her brief employment in April 2011, she had difficulty sitting for a long period of time and missed at least two days of work a week. (Tr. 65–66).

Dr. Lee Fischer, an impartial medical expert, testified next. (Tr. 68–69). Dr. Fischer had reviewed the medical evidence in the record and listened to Newton's testimony, and concluded that Newton's conditions included rheumatoid arthritis, fibromyalgia, asthma, diabetes, gastroesophageal reflux disease, and lumbar degenerative disease. (Tr. 69). Dr. Fischer then stated that he did not believe Newton's impairments met or equaled any listing, after having considered listings 1.02, 3.03, 9.08, and 14.09. (Tr. 70). As to Newton's residual functional capacity, Dr. Fischer believed that she could lift, carry, push, or pull 20 pounds occasionally and

10 pounds frequently; that she could sit, stand, and walk two hours each at a time and six hours each in an eight-hour day; that she could bend, crouch, drive, crawl, use foot controls, squat, climb stairs, and stoop occasionally; that she should avoid concentrated exposure to extremes in temperature and respiratory irritants and fumes and humidity; that she could never climb ladders, ropes, or scaffolds; and that she should avoid unprotected heights. (Tr. 71). He found no fine or gross manipulative limitations. (Tr. 72). In response to questions from Newton's counsel, Dr. Fischer acknowledged that while he had treated patients who had rheumatoid arthritis, he was only a family practitioner, so he would treat them for their associated conditions such as bronchitis or hypertension, but not their rheumatoid arthritis directly. (Tr. 73). He also indicated that he would not personally administer medications for that condition. (Tr. 73). Dr. Fischer opined that the documentation did not support Newton's assertion that she experienced flare-ups two to three times a week, though he also noted that flare-ups of rheumatoid arthritis typically last "for a while, maybe days or weeks." (Tr. 73–74).

Constance Brown, a vocational expert, testified last. (Tr. 77). The ALJ directed her to take into account each of the limitations Dr. Fischer had expressed, and asked if Newton would be able to perform any of her past work given those limitations. (Tr. 78–79). Ms. Brown concluded that she would not. (Tr. 79). The ALJ then asked, based on the same hypothetical, if there were any other jobs in the state or national economies that Newton could perform. (Tr. 79). Ms. Brown stated that there were, including cashiering positions, housekeeper/cleaner positions, and office machine operators, each of which qualifies as a light, unskilled job. (Tr. 79–80). In response to Newton's counsel, Ms. Brown stated that the average absenteeism tolerance for these positions was one day a month, and that any more than one absence a month would prevent someone from working in those positions. (Tr. 80–81).

The ALJ thereafter issued his decision on August 17, 2011, denying Newton's claim. (Tr. 16–30). At steps one and two, he found that Newton had not engaged in substantial gainful activity since her alleged onset date, and that her severe impairments were fibromyalgia, asthma, and rheumatoid arthritis. (Tr. 18–19). At step three, he found that her impairments did not meet or equal the severity of any listed impairment, after considering listings 1.02, 3.03, and 14.09 in particular. (Tr. 20–22). He therefore proceeded to formulate Newton's RFC, which he defined as follows:

> The claimant is limited to lifting, carrying, pushing, or pulling 20 pounds occasionally and 10 pounds frequently. She is able to sit, stand, or walk for 2 hours at a time. She is able to sit, stand, and walk for a total of 6 hours each in an 8-hour day. The claimant is limited to occasional bending, crouching, driving, crawling, squatting, climbing stairs, stooping, and using foot controls. She must avoid concentrated exposure to respiratory irritants, fumes, and humidity. She must avoid extremes in temperature. She is precluded from climbing ladders, ropes, and scaffolds. She must avoid unprotected heights.

(Tr. 22). The ALJ did not include any limitations relative to Newton's rate of absenteeism or her ability to manipulate objects. (Tr. 22–28). In formulating the RFC, the ALJ declined to give Dr. Tahir's opinion controlling weight, and he found that Newton's testimony as to the severity of her limitations was not fully credible. At step four of the analysis, the ALJ found that Newton was unable to perform any of her past work. (Tr. 28). However, he found at step five that jobs existed in significant numbers in the national economy that Newton could perform, taking into account her age, education, work experience, and RFC, as testified to by Ms. Brown. (Tr. 28–29). Accordingly, he concluded that Newton was not disabled, as defined under the Social Security Act. (Tr. 29–30).

### III. STANDARD OF REVIEW

The Commissioner's final decision in this case is subject to review pursuant to 42 U.S.C. § 405(g), as amended, which provides that "[t]he findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. As a result, the court "may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Conclusions of law, unlike conclusions of fact, are not entitled to deference. If the Commissioner commits an error of law, remand is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. ANALYSIS

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential

evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The five step process asks:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

If the claimant is performing SGA (step one) the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant does not have a severe medically determinable impairment or a combination of impairments that is severe and meets the duration requirement (step two), then the claimant will likewise be found not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is not performing SGA and does have a medically severe impairment, however, the process proceeds to step three. At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). In the alternative, if a Listing is not met or equaled, then in between steps three and four the ALJ must assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform his past work (step four) and whether the claimant can perform other work in society (step five). 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

In her appeal of the ALJ's decision, Newton argues that the ALJ erred in three respects, each of which relates to his formulation of her RFC at step three. Newton argues that the ALJ: (1) failed to consider the opinion of Ms. Willmann, Newton's treating nurse practitioner; (2) failed to articulate a good reason for declining to give controlling weight to the opinion of Dr. Tahir, or in the alternative, failed to consider and weigh Dr. Tahir's opinion; and (3) failed to articulate a proper basis for his adverse credibility determination as to Newton's testimony.

### 1. The ALJ Committed Reversible Error by Failing to Consider Ms. Willmann's Opinion

Newton first argues that the ALJ erred by failing to consider the opinion of Ms. Willmann, her treating nurse practitioner. ALJ's are required to consider all relevant evidence in the record in determining whether an individual is disabled. 42 U.S.C. § 423(d)(5)(B). This includes opinion evidence from "acceptable medical sources," such as licensed physicians; medical sources that do not qualify as "acceptable medical sources," such as nurse practitioners and physician assistants; and non-medical sources, such as former employers. 20 C.F.R. §§ 404.1527(c), 404.1513(d); SSR 06-03p. The latter two categories are considered "other sources." 20 C.F.R. § 404.1513(d). While these other sources are not eligible to receive controlling weight and may not be used to establish the existence of a medically determinable impairment, their opinions are still important, particularly with respect to "the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03p; 20 C.F.R. §§ 404.1527(c)(2); 404.1513(d)(1).

Accordingly, ALJ's should consider and weigh such opinions under a similar framework as acceptable medical opinions. *Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010) ("In deciding how much weight to give opinions from these 'other medical sources,' an ALJ should apply the same criteria listed in § 404.1527[(c)](2)."); SSR 06-03p. Specifically, the ALJ should

consider how long the source has known the claimant and how often they have seen the claimant; how consistent the opinion is with other evidence; the degree to which the source presents evidence to support an opinion; how well the source explains the opinion; and, whether the source has a specialty related to the claimant's impairments. SSR 06-03p; *see* 20 C.F.R. § 404.1527(c). The ALJ's decision must also reflect consideration of the opinions of "other sources" and the weight the ALJ gave them:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" . . . . [T]he adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p; *Phillips*, 413 F. App'x at 884.

Here, Ms. Willmann is a nurse practitioner, so her opinion and observations must be considered by the ALJ, and his decision must explain the weight he attributed to her opinion. However, as Newton argues, and as the Commissioner effectively concedes, the ALJ's decision does not contain any explanation of the weight he attributed to Ms. Willmann's opinions. The Commissioner argues that this is not an error since the ALJ's decision contained two citations to Ms. Willmann's treatment notes, suggesting that he had considered her opinion even if he did not expressly discuss it in his decision. First, however, although the decision contains two brief citations to Ms. Willmann's treatment notes relative to Newton's medications, it does not reflect that the ALJ was aware of or had considered her opinions relative to the severity of Newton's impairments and how they impacted her ability to function. To the contrary, the ALJ's decision specifically listed each of the medical sources whose opinions he considered and explained the

weight he gave to each, but did not reference or acknowledge Ms. Willmann's opinions.[5] (Tr. 25–28). Second, even if the ALJ considered Ms. Willmann's opinion, his decision did not minimally articulate what weight he gave to the opinion and why, which prevents the Court from conducting a meaningful review of the decision. *Frame v. Astrue*, No. 1:11-cv-1062-WTL-MJD, 2012 WL 3637583, at *9 (S.D. Ind. Aug. 21, 2012) ("[G]iven the importance and relevance of the information reflected in records authored by other medical sources, the ALJ must articulate a reasonable basis for rejecting other medical source opinions, which basis is grounded in substantive evidence in the record."). The ALJ's failure to address Ms. Willmann's opinions therefore constitutes error.

The Commissioner devotes the remainder of its response on this issue to arguing that remand is unnecessary because Ms. Willmann's opinions would not have changed the ALJ's decision. The "harmless error" doctrine is a narrow exception to the rule that an administrative agency's decision can only be affirmed on the grounds relied on by the agency. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). When an ALJ commits an error, a court may only affirm the decision "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is

---

5 Specifically, the decision states:

> As for the opinion evidence, the file contains several medical opinions regarding the claimant's functional limitations. The opinions submitted by the claimant's treating physician, Dr. Tahir, the consultative examiners, Dr. Hosein and Ceola Berry, Ph.D., along with the state agency medical consultants, J. Sands, M.D., and B. Randal Horton, Psy. D., have been considered. The undersigned has also given due consideration to the hearing testimony of Dr. Fischer and Dr. Olive.

(Tr. 26–27). The decision does not acknowledge Ms. Willmann's opinion or reflect that the ALJ was aware that he was required to consider and weigh it according to the factors in 20 C.F.R. § 404.1527(c).

overwhelmingly supported by the record though the agency's original opinion failed to marshal that support." *Spiva*, 628 F.3d at 353.

The Commissioner first argues that the ALJ's error is harmless because the RFC accounted for "most" of the limitations Ms. Willmann described. This argument does not violate the *Chenery* principle, since the error would be harmless if Ms. Willmann's opinions were already reflected in the RFC. However, this argument fails on the facts, since the ALJ only accounted for some, not all, of these limitations in Newton's RFC. Ms. Willmann stated that Newton had "Significant" limitations in lifting, pushing, pulling, bending, squatting, crawling, climbing, reaching above the shoulders, and being around machinery, and stated that Newton "cannot do these [due to] risk of further damage to joints." (Tr. 363). Ms. Willmann further stated that Newton cannot do "heavy work," but that she could do a "sit down job." (Tr. 362). In formulating the RFC, however, the ALJ found that Newton could lift, push, and pull "20 pounds occasionally and 10 pounds frequently," and that she could "occasional[ly]" bend, squat, crawl, and climb, even though Ms. Willmann opined that Newton could "never" do these activities. (Tr. 22, 363). The ALJ further found that Newton could stand or walk for "2 hours at a time" and for "a total of 6 hours each in an 8-hour day," even though Ms. Willmann believed that Newton could only perform a "sit down job" and could not "tolerate any sustained activity for any length of time." (Tr. 22, 362, 444). Based on these inconsistencies, the Court cannot conclude that the ALJ's failure to consider and weigh Ms. Willmann's opinion was harmless.

The Commissioner next argues that the ALJ's decision should be affirmed regardless of this error since the ALJ would not find Ms. Willmann's opinion to be credible. The Court need not address this argument on its merits, however, since it clearly violates the *Chenery* principle. *Phillips*, 413 F. App'x at 884, 887 (remanding an ALJ's decision where he did not cite any

legitimate reason for rejecting a physician's assistant's opinion, even where the court observed that an ALJ "might be skeptical" of the opinion, on the basis that the ALJ had not relied on those grounds). The ALJ did not address Ms. Willmann's opinion in his decision, so any argument that he would have discredited her opinion if he had considered it is a "post-hoc rationalization" that the Court cannot consider on appeal. *Id.* at 887. Therefore, because the ALJ erred in failing to consider and weigh Ms. Willmann's opinion, and because the Court cannot conclude with great confidence that this error was harmless, this case must be remanded to the Commissioner for further proceedings.

### 2. Additional Issues to be Considered on Remand

Having determined that remand is necessary, the Court need not rule definitively on Newton's remaining arguments. However, for the sake of completeness and to help ensure that the Commissioner's decision on remand is free from unnecessary errors, the Court will briefly address these additional issues. First, as to Dr. Tahir's opinion, Newton takes issue with the ALJ's decision not to afford it controlling weight. The ALJ articulated three reasons for this decision, two of which related to whether the opinion was well-supported by acceptable evidence in the record, and one of which addressed a purported inconsistency with other evidence, namely that Dr. Tahir's opinions relative to Newton's limitations were inconsistent with the fact that Newton had experienced relief through her medication regimen.

Though Newton takes issue with all three reasons, the Court believes the latter reason is particularly problematic. The ALJ noted that Newton had experienced significant relief due to her medication regimen, and that "[n]o notable changes in this regimen are present, which suggests the relief provided is adequate." (Tr. 26). As the Seventh Circuit has observed, however, "There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce . . . ." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Dietz*

*v. Colvin*, No. 2:11-cv-442, 2013 WL 3834764, at *8 (N.D. Ind. July 24, 2013) (same); *Twaits v. Astrue*, No. 1:12-cv-162, 2013 WL 1343532, at *8 n.5 (N.D. Ind. Apr. 2, 2013) (same). Thus, the fact that Newton experienced relief through her medication is not necessarily inconsistent with Dr. Tahir's opinion that Newton would miss more than four days of work a month. Though there are several statements in the record indicating that Newton's medication provided some relief, there is no indication whatsoever that the medication eradicated her symptoms or limitations. In fact, the record suggests that Newton continued to suffer substantial limitations despite the relief that her medications provided. Further, in the case of a progressive and degenerative illness such as rheumatoid arthritis, saying that the condition is "well-controlled" may only mean that its progression has been slowed, not that the patient is no longer suffering from its effects. (*See* Tr. 591 (noting that the Newton's prognosis is a "downhill course"); Tr. 362 (noting that Newton has a "progressive disease" and that her functional limitations will not improve)).  Accordingly, although the efficacy of medication in relieving disabling symptoms may be a legitimate basis for discrediting medical source opinions, the Court would encourage the ALJ to articulate more specifically how the effects of Newton's medications create inconsistencies with Dr. Tahir's opinion, should he decide to rely on such considerations on remand.

Second, even if the ALJ ultimately decides not to give Dr. Tahir's opinion controlling weight, he is still required to weigh Dr. Tahir's opinion based on the factors outlined in 20 C.F.R. § 404.1527(c). "'If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.'" *Scott*, 647 F.3d at 740 (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)). The ALJ did not do so here. Though

his analysis of whether to give Dr. Tahir's opinion controlling weight touched on the consistency and supportability of Dr. Tahir's opinion, the ALJ did not address any of the other factors, several of which would tend to support Dr. Tahir's opinion. Dr. Tahir is a specialist in rheumatology, and had met with and examined Newton every one to two months for over one and a half years at the time she rendered her relevant opinions. Given that the only contrary evidence in the record as to Newton's probable rate of absenteeism was the testimony of Dr. Fischer, who had never examined Newton and who admitted that he did not specifically treat rheumatoid arthritis, these may have been meaningful considerations, but the ALJ's decision does not reflect that he considered them.

Finally, Newton objected to the ALJ's bases for discounting her credibility. A court may overturn a credibility determination "only if it is patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). However, the ALJ's decision "must contain specific reasons for the credibility finding[,] . . . must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Id.* The ALJ's credibility determination here was problematic in several respects. The decision begins with an oft-criticized template stating that the claimant is not credible to the extent her statements are inconsistent with the RFC. (Tr. 25); *see Ronning v. Colvin*, No. 13-2074, slip op. at 5 (7th Cir. Feb. 18, 2014); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). The decision then proceeds to identify two specific reasons for the adverse credibility finding. The decision states that the ALJ first "measured the objective medical findings against the claimant's subjective complaints." (Tr. 25). In explaining his application of this factor, the ALJ stated, "The original diagnosis of fibromyalgia is not present in the record; however, the undersigned accepts that Dr. Tahir recorded 'multiple tender points' during her physical examination. As a precaution, the

undersigned incorporated limitations reasonable [*sic*] attributable to a diagnosis of fibromyalgia." (Tr. 25). Putting aside the fact that there are multiple diagnoses of fibromyalgia in the record, it is unclear how this would in any way undercut Newton's credibility; the ALJ himself accepted Newton's diagnosis of fibromyalgia and found that it qualified as a severe impairment, so it is puzzling how the ALJ could consider Newton's subjective complaints associated with that condition to be a basis for challenging her credibility.

The second factor the ALJ considered was the "consistency or lack of consistency between the claimant's allegations of disabling symptoms and her reports to treatment providers." (Tr. 25). In applying this factor, the ALJ stated:

> The undersigned observes the claimant reported significant improvement in her rheumatoid arthritis symptoms with the addition of etanercept to her medication regimen. In fact, when she had to abstain from her medication for two weeks in anticipation of foot surgery, the claimant noted that she could "tell a big difference," and had much more pain without her medication.

(Tr. 25). As the Court previously discussed, however, there is no inherent inconsistency between Newton's reports of disabling symptoms and the fact that she could tell that her medication made a big difference. *Scott*, 647 F.3d at 739. Thus, the Court cannot conclude that this would constitute basis for discrediting Newton's testimony, either. Accordingly, the ALJ should revisit this analysis on remand to provide adequate justification should he find Newton's testimony incredible.

## V.  CONCLUSION

For the aforementioned reasons, the Court **GRANTS** Newton's request to remand the ALJ's decision. [DE 1]. Accordingly, the Court **REMANDS** this case to the Commissioner for further proceedings consistent with this order.

SO ORDERED.

ENTERED:  February 25, 2014 

                              _____/s/ JON E. DEGUILIO_____
                              Judge
                              United States District Court